UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,    ) | |
|         Plaintiff,    ) | |
|                     ) | |
| v.                  ) | CAUSE NO.: 1:17-CR-44-TLS-PRC |
|                     ) | |
| BILLY HARRIS,        ) | |
|         Defendant.    ) | |

**FINDINGS, REPORT, AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE PURSUANT TO
28 U.S.C. § 636(b)(1)(B) & (C)**

This matter is before the Court on a Motion to Suppress [DE 30], filed by Defendant Billy Harris on March 21, 2018. Defendant requests that any evidence obtained from the search of a residence at XXX Boltz Avenue, Fort Wayne, Indiana, on July 28, 2017, be suppressed because, he alleges, the search was conducted without a warrant and without valid consent.

On April 12, 2018, District Court Chief Judge Theresa L. Springmann entered an Order of Referral [DE 38] referring this matter to the undersigned Magistrate Judge for a report and recommendation on the instant motion pursuant to 28 U.S.C. § 636(b)(1)(B). This Report constitutes the undersigned Magistrate Judge's combined proposed findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). Finding that the search was conducted pursuant to valid consent, the Court recommends that the District Court deny the Motion to Suppress.

**PROCEDURAL BACKGROUND**

Defendant Billy Harris is charged by way of a single count Indictment charging him with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The Indictment also includes a forfeiture allegation. Evidence supporting the Indictment was recovered from the residence at XXX Boltz Avenue, Fort Wayne, Indiana, during a search at that address on July 28, 2017.

On March 21, 2018, Defendant filed the instant Motion to Suppress, requesting that any physical evidence seized from XXX Boltz Avenue, Fort Wayne, Indiana, be suppressed because the evidence was seized allegedly in violation of his Fourth Amendment rights. The Government filed a response on April 11, 2018, and Defendant filed a reply on April 23, 2018. On May 7, 2018, the Court held an evidentiary hearing on the motion, receiving testimony and other evidence. On July 23, 2018, Defendant filed a post-hearing brief, to which the Government filed a response on August 22, 2018.

## FACTUAL BACKGROUND

On July 28, 2017, Special Agent T.J. Worthen ("SA Worthen"), ATF Task Force Officer Caleb Anderson ("TFO Anderson"), and Indiana State Police Trooper James Stanley ("Trooper Stanley") went to XXX Boltz Avenue, where Defendant was thought to be living. (Redacted Tr. 15:3-4, 16:6-9, ECF No. 48). As the law enforcement officers approached the house at XXX Boltz Avenue, Brian Jones, later identified as Defendant's stepfather, exited the house and spoke with the officers. *Id.* at 17:6-19. When Mr. Jones tried to re-enter the house, he had to knock on the door because the door had been closed and locked behind him. *Id.* at 17:21-24.

Around the same time, Defendant's mother, Beverly Maxine Harris, arrived at the house. *Id.* at 18:15-16. SA Worthen testified that he received Ms. Harris's consent to enter the home. *Id.* at 21:24-22:1, 23:4-7. Ms. Harris testified that she did not want the law enforcement officers in her home and that she told SA Worthen that she would have Defendant come outside to talk. *Id.* at 66:2-5. A recording of the encounter at XXX Boltz Avenue, taken from an audio recording device worn by SA Worthen, has been admitted into evidence. This recording reveals that SA Worthen approached Ms. Harris and reported that law enforcement had observed suspected drug activity

2

taking place at the address. (Hr'g Ex. 15 at 00:03:03-:05). SA Worthen informed Ms. Harris that she was not suspected of being involved in drug activity herself and that he wanted to talk to Defendant. *Id.* at 00:03:27-:03:58. Ms. Harris originally said "I'll get [Defendant] to come out and talk to you . . . ." *Id.* at 00:03:58-:04:04. SA Worthen suggested instead that he go in the house to talk. *Id.* at 00:04:24-26 ("So let's go in, I mean that way everybody knows."). A response of "yeah" can be heard on the recording. *Id.* at 00:04:27. The Court finds that Ms. Harris gave verbal permission for the law enforcement officers to enter her house to talk to Defendant.

  SA Worthen testified that, upon approaching the residence, he smelled the odor of burnt or raw marijauna or spice. (Redacted Tr. 16:21-22). He also saw a digital scale, residual marijuana around the scale, and a marijuana blunt on the porch. *Id.* at 22:7-17. TFO Anderson testified to also seeing a shell casing while he was on the porch. *Id.* at 41:13-17. SA Worthen further testified that when he tried to enter the house, Defendant allowed Ms. Harris to enter the residence, and then Defendant stepped into the doorway to block SA Worthen's entry. *Id.* at 24:17-21. Defendant appeared apprehensive. *Id.* at 24:14-16. SA Worthen and TFO Anderson ultimately entered the house to talk with Defendant with Ms. Harris's express permission. *Id.* at 23:4-7, 25:16-18; (Hr'g Ex. 15 at 00:09:55-:10:05). The combined testimony of SA Worthen and TFO Anderson is that rounds of ammunition, an ammunition magazine, and something appearing to be marijuana residue were in plain view inside the house. (Redacted Tr. 26:10-13, 44:18-21).

  SA Worthen testified that, after receiving consent to enter the house and observing the items in plain view, he informed Ms. Harris that he would be able to obtain a search warrant due to what had been seen at the house. *Id.* at 78:21-79:16. The audio recording reveals that law enforcement

3

told the house occupants that a search warrant could be obtained because of the scale, bullet casing, and marijuana blunt on the porch and the marijuana in the house. (Hr'g Ex. 15 at 00:10:50-:11:38).

SA Worthen further testified that he did not talk to the occupants of the Boltz Avenue residence in either a hostile or a threatening manner, nor did he demand that any occupant consent to a search. *Id.* at 79:17-24. Defendant testified that, at some point after the law enforcement officers entered the home, he went outside and asked to speak to SA Worthen there. *Id.* at 86:11-13.

Ms. Harris testified that she allowed the officers into her home because she did not want trouble. (Redacted Tr. 67:11-15). She further testified that she initially indicated that her house could not be searched but later gave consent to search after she was informed that the law enforcement officers could get a search warrant. *Id.* at 68:8-18.

TFO Anderson testified as follows. Ms. Harris never said that she did not want her home searched. *Id.* at 80: 22-24. He had Ms. Harris accompany him while he searched the house so that she could easily withdraw her consent to the search if she wanted to do so. *Id.* at 45:18-24. Ms. Harris was helpful during the search. *Id.* at 50:21-25. None of the house's occupants in his presence told a law enforcement officer to leave or to stop searching the house, he did not threaten or raise his voice to any occupant with regard to the search, and no law enforcement officer in his presence told any occupant that he or she must consent to the search. *Id.* at 49:25-50:17, 81:6-8.

Trooper Stanley testified that he did not hear any of the house occupants protest to the search or tell the officers to stop searching or to get out of the house, nor did he hear an officer threaten anyone in the house or demand anyone give consent to the search. *Id.* at 10:10-25. SA Worthen testified that at no point during his participation in the search did he hear any occupant tell the

4

officers to stop searching or leave the house, nor did he hear an officer threaten any occupant or demand consent. *Id.* at 31:8-23.

Regarding the conflicting testimony regarding whether Ms. Harris ever expressed a lack of consent to a search of her home, the Court finds the law enforcement officers' version to be more credible. In addition to the Court's observation of the witnesses at the hearing, the separate testimony of each officer corroborates the others, and this version of events is more consistent with Ms. Harris's subsequent helpfulness during the search and demeanor as preserved on the audio recording. Thus, the Court finds that Ms. Harris never told a law enforcement officer that she did not want her house to be searched.

## ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Cons. amend. IV. Searches conducted without a warrant are per se unreasonable unless an exception applies, and one exception to the warrant requirement is a search conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *see also Fernandez v. California*, 571 U.S. 292, 298 (2014) ("Consent searches are part of the standard investigatory techniques of law enforcement agencies and are a constitutionally permissible and wholly legitimate aspect of effective police activity." (internal quotation marks omitted) (quoting *Schneckloth*, 412 U.S. at 228)).

Defendant argues that all evidence seized by law enforcement from the XXX Boltz Avenue house during the warantless search on July 28, 2017, should be suppressed pursuant to the Fourth Amendment. The Government argues that the search was permissible because it was conducted pursuant to valid consent. Valid consent to a search must be voluntary, and the Government bears

5

the burden of establishing that the consent obtained was voluntarily given. *United States v. Johnson*, 495 F.3d 536, 541 (7th Cir. 2007).

Whether consent was given voluntarily is determined by the totality of the circumstances. *Schneckloth*, 412 U.S. at 227. The determination considers such things as "(1) the person's age, intelligence, and education, (2) whether [she] was advised of [her] constitutional rights, (3) how long [she] was detained before [she] gave [her] consent, (4) whether [her] consent was immediate, or was prompted by repeated requests by the authorities, (5) whether any physical coercion was used, and (6) whether the individual was in police custody when [she] gave [her] consent." *Johnson*, 495 F.3d at 541.

On the audio recording, Ms. Harris can be heard telling SA Worthen that she would get Defendant to come out and talk to SA Worthen. SA Worthen then suggested that they go inside the house, and Ms. Harris agreed. Further, at the front door where Defendant blocked the officers from entering the home, SA Worthen again verified with Ms. Harris that she had given him permission to enter the house. (Hr'g Ex. 15 at 00:09:55-:10:05). Ms. Harris testified that she told the officers that they could enter. (Redacted Tr. 67:5-7). She followed up this testimony by clarifying that she allowed them to enter because she did not want them getting a warrant and because she didn't want any trouble. *Id.* at 67:9-15. At this point in the encounter, however, the audio recording reflects no conversations between the officers and Ms. Harris about obtaining a warrant, so there was no coercion by the officers on this basis for the consent given at that time to enter the house. The issue of mentioning obtaining a search warrant will be addressed more fully below regarding Ms. Harris's consent to search the house.

6

There is no evidence of coercion of Ms. Harris. She gave her consent to enter the residence promptly. No one was in custody. No evidence suggests that her age, intelligence, or education should weigh against a finding that Ms. Harris's consent to enter the house was given voluntarily. The Court finds that, in the totality of the circumstances, Ms. Harris voluntarily gave consent for the officers to enter the house for the purpose of talking to Defendant.

The Court's analysis does not conclude here. Even if valid consent is obtained from one person, "a physically present inhabitant's express refusal of consent" will trump the valid consent of a co-occupant. *Georgia v. Randolph*, 547 U.S. 103, 122 (2006).

Defendant maintains that his actions demonstrated a lack of consent. Here, Defendant stood in the doorway of the house and initially blocked the officers' path when they tried to enter the house. Defendant insists that this shows clear intent that Defendant did not consent to the officers entering the house. However, after SA Worthen verified with Ms. Harris that she consented to the officers' entry into the house, Defendant allowed the officers to enter, and he never raised a vocal or otherwise express objection to the officers entering the house. Defendant did not tell the officers to leave the house. Defendant did not make an "express refusal of consent to a police search" so as to invalidate Ms. Harris's consent per the holding of *Randolph*. 547 U.S. at 122; *see also United States v. Lewis*, 608 F.3d 996, 999 (7th Cir. 2010) (finding consent to enter an apartment valid where the defendant did not object to the officers entering after the defendant opened the door for a third party to enter); *United States v. Walls*, 225 F.3d 858, 863 (7th Cir. 2000) (finding that stepping back to allow officers to enter conveys consent). Thus, Ms. Harris's consent is not vitiated, and the officers were in the house pursuant to valid consent.

Having addressed Ms. Harris's consent for law enforcement to enter the house, the Court now turns to the main dispute in the motion: whether there was valid consent to search the house. Defendant asserts that Ms. Harris's consent to the search was not voluntary based on the totality of the circumstances. Defendant presents the following argument in support:

> Though [Ms. Harris] was told that [the law enforcement officers] were not there to arrest her son, three officers were standing on her front porch when she arrived home, and told her that her home had been under surveillance, and they had observed what they believed to be drug transactions at her home. They told her that they would get a warrant. Subjectively, Ms. Harris said she had never been in trouble, and only allowed the officers into her home because she did not want them getting a warrant, and didn't want any trouble.

(Def.'s Br. 5, ECF No. 51). Defendant notes that there is no testimony in the record that Ms. Harris was informed of her right to refuse to consent to the search. No such notice is required, *Schneckloth*, 412 U.S. at 235, though it is considered as part of the totality of the circumstances, *Johnson,* 495 F.3d at 541. Defendant also cites to opinions from Indiana state courts, but he concedes that those opinions do not control here.

"A baseless threat to obtain a search warrant may render consent to search involuntary. Yet when the officer's expressed intention to obtain a warrant is genuine, . . . and not merely a pretext to induce submission, it does not vitiate consent to search." *United States v. Hicks*, 650 F.3d 1058, 1064 (7th Cir. 2011) (internal citations and quotation marks omitted) (quoting *United States v. Hicks*, 539 F.3d 566, 571 (7th Cir.2008) [hereinafter *Hicks I*]). If there is probable cause or "a reasonable factual basis to believe there was probable cause" for the search warrant spoken of, then the statement about getting a search warrant is genuine and not a baseless threat. *Id.* (quoting *Hicks I*, 539 F.3d at 571).

Here, the officers told Ms. Harris that they had probable cause for a search warrant because of what the officers saw outside and inside of the house. Before entering the house, the officers saw a bullet casing, a marijuana blunt, and a digital scale with marijuana residue and smelled marijuana or spice. Inside of the house, where they were pursuant to Ms. Harris's consent as addressed above, SA Worthen and TFO Anderson testified that they saw rounds of ammunition and a pistol magazine in plain view. (Redacted Tr. 26:4-15; 43:20-44:1). TFO Anderson also testified to seeing a bag with what looked like marijuana residue on top of it. *Id.* at 44:19-21. SA Worthen had a reasonable factual basis to believe that sufficient probable cause for a warrant existed. Thus, the Court finds that SA Worthen's statement about getting a search warrant was genuine, and this statement does not vitiate Ms. Harris's consent.

Further, the Government presented evidence, which Defendant does not refute, that the law enforcement officers did not threaten or even raise their voices to any of the XXX Boltz Avenue occupants. Ms. Harris did not express a lack of consent to the search and was actively helpful during the search. As before, there was no prolonged delay in obtaining consent, no one was in custody, there was no physical coercion, and no one has raised an issue regarding Ms. Harris's age, intelligence, or education. Despite SA Worthen's genuine statement that he could get a search warrant for the residence, the Court finds that, based on the totality of the circumstances, Ms. Harris voluntarily consented to the search of the house at XXX Boltz Avenue.

Once again, the Court must determine whether, despite Ms. Harris's valid consent, Defendant was physically present and made an "express refusal of consent." *Randolph*, 547 U.S. at 122. As discussed above, Defendant maintains that his actions demonstrated a lack of consent such that the search of the XXX Boltz Avenue house was unreasonable as to him. Though he blocked the

9

doorway at one point, he later allowed the officers to enter. Defendant did not make an "express refusal of consent to a police search" so as to invalidate Ms. Harris's consent to search per the holding of *Randolph*. 547 U.S. at 122. The *Randolph* Court noted that a "potential objector, nearby but not invited to take part in the threshold colloquy, loses out." *Id.* at 121. At one point during the events at XXX Boltz Avenue, Defendant was at the threshold, but he made no express refusal of consent to enter or consent to search at that time. The evidence shows that he was reticent to allow the officers inside the residence, but his actions fell short of objecting to the officers' actions or requests to enter or to search. Defendant never voiced an objection to the search, even after it began. Thus, Ms. Harris's consent is not vitiated, and the search was conducted pursuant to valid consent. The search did not violate Defendant's rights under the Fourth Amendment.

## CONCLUSION

Based on the foregoing, the Court **RECOMMENDS** that the District Court **DENY** the Motion to Suppress [DE 30].

This Report and Recommendation is submitted pursuant to 28 U.S.C. § 636(b)(1)(C). Pursuant to 28 U.S.C. § 636(b)(1), the parties shall have fourteen (14) days after being served with a copy of this Recommendation to file written objections thereto with the Clerk of Court. The failure to file a timely objection will result in waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. *Willis v. Caterpillar, Inc.*, 199 F.3d 902, 904 (7th Cir. 1999); *Hunger v. Leininger*, 15 F.3d 664, 668 (7th Cir. 1994); *The Provident Bank v. Manor Steel Corp.*, 882 F.2d 258, 260-261 (7th Cir. 1989); *Lebovitz v. Miller*, 856 F.2d 902, 905 n.2 (7th Cir. 1988).

So ORDERED this 14th day of September, 2018.

                                             s/ Paul R. Cherry
                                            MAGISTRATE JUDGE PAUL R. CHERRY
                                            UNITED STATES DISTRICT COURT